# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **APRIL BIAGIONI**, | ) | |
| Individually and as next friend of | ) | |
| A.B., D.B., and J.B., | ) | |
| **MARK BIAGIONI**, | ) | |
| Individually and as next friend of | ) | |
| A.B., D.B., and J.B., | ) | Civil Action File No.: |
| **A.B.**, **D.B.**, and **J.B.**, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CITY OF DECATUR SCHOOL** | ) | |
| **DISTRICT**, and **MAGGIE FEHRMAN**, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs April Biagioni, Mark Biagioni, and their three minor children, D.B., A.B., and J.B., file this Complaint against Defendants City of Decatur School District and Superintendent Maggie Fehrman in her individual capacity, (hereinafter collectively referred to as "Defendants"), showing the Court as follows:

## **Introduction**

1.     This is a case arising from intentional and malicious violations by Defendants City of Decatur School District ("CDSD" or the "District") and its Superintendent Maggie Fehrman, of Plaintiffs' direct and associational First Amendment rights, Americans with Disabilities Act and Rehabilitation Act rights, and violations of Plaintiffs' Fourteenth Amendment rights to Equal Protection, Due Process, and other privileges and immunities enjoyed by the residents of Decatur, GA.

## **Jurisdiction and Venue**

2.     Plaintiffs' claims present federal questions over which this court has jurisdiction pursuant to 28 U.S.C. § 1331.

3.     The violations of Plaintiffs' rights occurred in the Northern District of Georgia. Venue is proper under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

## THE PARTIES

4.     Plaintiffs April and Mark Biagioni are a married couple, citizens of the United States, and residents of Rabun County in the state of Georgia.

5.     Plaintiffs D.B. (D.O.B. 2010), A.B. (D.O.B. 2013), and J.B. (D.O.B. 2016) are the minor children of Plaintiffs April and Mark Biagioni and resided with them at all relevant times.

6.     Defendant CDSD is a local public school district operating by virtue of Art. VIII, § VII, ¶ 1 of the Constitution of the State of Georgia, which granted authority to counties to establish and maintain public schools within their limits but reserved authority in municipalities to maintain existing independent school systems. CDSD is governed by the City of Decatur Board of Education and may be served with process by service upon its Chief Executive Officer, Maggie Fehrman.

7.     Defendant Maggie Fehrman is and was at all relevant times the Superintendent of Defendant CDSD.   She is sued in her individual capacity. Fehrman is subject to the jurisdiction of this Court and may be served with process by personal service or leaving copies of the summons and complaint at her place of work or her dwelling house or usual place of abode with some person of suitable age and discretion residing there, or by delivering a copy of the summons and complaint to an agent authorized to receive service of process.

## FACTUAL BACKGROUND

8.     Plaintiffs were long-time residents of the City of Decatur, Georgia and active in the community until approximately October 2021.

9.     In particular, April Biagioni was a vocal citizen and parent advocate, frequently engaging in speech as a citizen and community member to question, protest, and/or criticize School District decisions.

10.     Plaintiffs A.B., D.B., and J.B. were enrolled as students in CDSD for all their school age years until October 2021.

11.     During all relevant times, Plaintiffs Mark and April Biagioni owned a residential home within the geographic boundaries of Decatur, Georgia, which was their permanent residence.

12.     Plaintiffs Mark and April Biagioni were registered to vote as bona fide residents in Decatur, Georgia at all times relevant to the claims here and neither claimed nor owned any other permanent domicile or residence at any time prior to A.B., J.B., and D.B.'s involuntary withdrawal from enrollment from CDSD by Defendants in October 2021.

### A. A.B., D.B., and J.B.'s Disabilities and Special Education Needs

13.     CDSD deemed D.B. eligible for an Accommodation Plan for his qualifying disabilities under Section 504 of the Rehabilitation Act.

14.     CDSD deemed A.B. eligible for special educational services under the Individuals with Disabilities in Education Act ("IDEA").  He had a legally binding Individualized Educational Plan ("IEP").

15.     A.B. also has an asthma diagnosis, which is a chronic respiratory condition that placed him at particularly high risk of life-threatening consequences if he contracted COVID-19.

16.     J.B. had an IEP for speech, and his CDSD teachers had flagged him for possible eligibility in other categories under IDEA.

**B. Plaintiff April Biagioni's Vocal Public Advocacy regarding CDSD's Handling of Educational Services during COVID-19 Pandemic**

17.     On September 22, 2020, Mrs. Biagioni (who was never employed by CDSD) and several CDSD teachers organized outside the CDSD central office to protest the District's announcement that it would resume in-person instruction.

18.     At that time, the District had no mask mandate, and no vaccine had yet been developed and deemed safe for children.

19.     As a result, in light of A.B.'s asthma, Plaintiffs determined that in-person attendance was unsafe and not an option for any of the children because of the risk of contracting COVID-19.

20.    Mrs. Biagioni publicly criticized and led protests regarding the lack of safety measures (such as a mask mandate) in the reopening plan.

21.    Mrs. Biagioni also signed a petition around that time (Fall 2020) related to the absence of scientific data supporting the reopening plan proposed by former Superintendent, David Dude.

22.    On October 9, 2020, Mrs. Biagioni organized a second protest of the reopening plan.

23.    Between October 10-14, 2020, she sent several emails to School Board members and spoke out at public meetings regarding CDSD's ill-conceived and unsafe reopening plan for students forced to resume in-person with serious health risks, such as A.B.

24.    On October 28, 2020, Mrs. Biagioni joined a community stakeholder reopening group.  Dr. Dude assigned her to the Employee committee.

25.    At the committee meeting, Mrs. Biagioni observed an absence of any diversity, so she sent emails to local advocacy groups and District officials pointing out the District's exclusion of community members from diverse backgrounds based on race and disability in these committees related to the reopening plans.

26.     Representation of stakeholders from diverse backgrounds was a significant public issue because there was a concern that certain groups might be disparately impacted without deliberative decision-making regarding the return to in-person instruction.

27.     On November 2, 2020, Mrs. Biagioni wrote a letter to the former Superintendent on behalf of community groups to create a virtual learning subcommittee that can consider the impact of returning to in-person instruction on vulnerable communities and evaluate the disparate impact on students of color and students with disabilities of pandemic-related decisions regarding in-person versus virtual instruction.

28.     On December 9, 2020, Mrs. Biagioni made public comments at a Board meeting expressing safety concerns about in-person instruction, particularly for immune-compromised students.

29.     She also sent emails on December 15 and 18, 2020, and January 1, 2021, regarding her safety concerns for the opening.

30.     On January 4, 2021, Mrs. Biagioni placed a visual memorial dedicated to school employees nationwide who died from COVID in public view on District property to remind the District and those in the community of the lives lost from COVID among educators.

31.     The District removed the memorial immediately.

32.     On March 9, 2021, Mrs. Biagioni spoke during public comment at a Board meeting and was quoted in an article in a local media outlet the next day regarding financial improprieties alleged in a prior lawsuit against the District and its former Superintendent.  She also questioned a District official for demonstrating a pattern of passing blame to Black female subordinates for issues raised with his administration.

33.     On April 16, 2021, Mrs. Biagioni, along with members of community group Beacon Hill Black Alliance and other parent activists, held a press conference calling for more transparency from CDSD and accountability for the former Superintendent's actions.   This press conference was covered by Fox Channel 5 News.    https://www.youtube.com/watch?v=1B6vo5d1_pM.    Around this time, Mrs. Biagioni gave a joint statement from Indivisible 7, Antiracist Coalition of Decatur, and Georgia Safe Reopening.

34.     On April 20, 2021, Mrs. Biagioni and others launched additional petitions identifying issues in the District's leadership and demanding Dr. Dude's firing.

35.     The group, including Mrs. Biagioni, protested during discussions of Dude's contract negotiation and salary raise to prevent him from securing further

compensation windfalls while allegations of financial misconduct were pending against him.

36.    On or about May 5, 2021, Mrs. Biagioni published a Facebook post to share with other parents after a CDSD employee reached out to her for help to circulate a concern about reduction in Spanish hours for students, which the District had steadily cut since 2009.

37.    This employee expressed frustration that the District unilaterally cut Spanish instruction without consulting the teachers or parents.

38.    On May 6, 2021, Defendant Maggie Fehrman personally emailed Mrs. Biagioni, stating,

> A community member shared a post you made on Facebook regarding a decrease in Spanish hours for K-5 students. We are not planning on decreasing our Spanish instruction by even one second for next year…In order to prevent misinformation going out to the community, I would greatly appreciate it if you reached out to me to ensure you have correct information before posting information on social media.  I would also greatly appreciate it if you removed the inaccurate information from your post.

39.    After receiving Defendant Fehrman's email, Mrs. Biagioni confirmed with school-based officials that Spanish hours were indeed cut.

## C. **CDSD Creates a Virtual Academy in Response to Mounting Parent Concerns Regarding Defendants' Hasty Plan to Return to In-Person Instruction**

40.     In response to increasing community demand for a virtual option for students with health conditions that compromised their ability to return in person without a mask mandate or vaccine, the CDSD formed the Decatur Virtual Academy ("DVA") in Spring 2021.

41.     In March 2021, Mrs. Biagioni asked District officials whether any special education service hours would be cut for students enrolling in the virtual academy, to which CDSD officials responded they would not.

## D. **CDSD Officials Actively Misrepresent the Quality and Flexibility of the DVA Program to Families in Spring 2021**

42.     At a meeting of the DVA Advisory Team dated April 29, 2021, Kristy Beam, Associate Superintendent and leader of DVA, announced to the meeting attendees that DVA was "great for families who traveled."

43.     On May 11, 2021, Ms. Beam publicly stated at a Board meeting that one of the purposes of the DVA was to accommodate families who wished to travel, such as "sports and film" families.

44.     One family delayed a return from Europe after the summer of 2021, and CDSD permitted the students to access DVA instruction from Europe for a period of time at the beginning of Fall 2021.

45.     The School District also permitted families who must temporarily reside outside the District boundaries due to home renovations to continue their enrollment in the District despite not residing within the District's geographic boundaries.

46.     Defendants singled Mrs. Biagioni out to actively monitor her Facebook activity to fish for reasons to take adverse action against the family, while ignoring or failing to involuntarily withdraw other families it knew to be accessing instruction from outside the boundaries of Decatur.

**E.  Contrary to its Promises of Equal Educational Opportunity at the DVA, CDSD Drastically Shrinks Services to DVA Students in Fall 2021, including cutting almost 90% of Plaintiff's Services**

47.     At the commencement of the 2021-2022 school year, the School District reduced A.B.'s special education service hours from 24.13 to 3 hours per week without any student educational data to support the reduction in hours.

48.     On August 13, 2021, two weeks into school, A.B. had still not received any of his legally required special education services as stated on his IEP.

49.     On or about that date, Mrs. Biagioni sent an email to Kristy Beam and Kisma Callwood asking when he would receive legally required services.

50.     Mrs. Biagioni also requested data to support the reduction in service hours from 24.13 to 3 hours, which was an approximately 87% reduction in special education hours without any substantial change in A.B.'s educational needs.

51.     In response, Ms. Beam and Ms. Callwood represented falsely that an outside vendor called Pearson's was responsible for implementing IEPs for DVA students.

52.     Mrs. Biagioni submitted a Georgia Open Records Act request for the Pearson's contract, which showed that it had no responsibility for implementing IEPs or 504 plans.

53.     Mrs. Biagioni followed up with CDSD's Special Education Director, Frances Holt, to understand the reduction in A.B.'s special education hours.  Ms. Holt explained that because DVA followed an asynchronous model (not aligned to a five-hour school day), the District had no obligation to provide the full span of services or hours available to in-person students.

54.     Ms. Holt's explanation was inconsistent with the District's representation in Spring 2021 to parents that enrollment in the DVA would not

result in a reduction in any special education services or hours based on the DVA's asynchronous model.

55.   The District previously represented that DVA families would be offered a synchronous option, which would have ensured that their general education hours would not have dropped.

56.   In the Fall of 2021, the District backpedaled on its synchronous model by offering DVA families with students with special needs only the substantially whittled down asynchronous model with far fewer general education hours.

57.   CDSD's whittling down of the general education offering of the DVA significantly hampered students, such as Plaintiff A.B., who depended on the five-hour school day for sufficient hours to provide a proportional special education program that enabled them to make progress on their goals and objectives.

58.   Because A.B. was asthmatic and could not attend school in person because of COVID-19 without safety measures such as a mask mandate or vaccines, he was forced to accept an insufficient general and special education program that reduced his education by 87%.

**F.  CDSD's Vague and Selectively Applied Residency Policy**

59.   CDSD's Administrative Regulation 4.1(D) provides, in part, as follows:

To classify as a resident student, a student shall be required to reside with the parent, legal custodian or legal guardian within the city limits of the City of Decatur. For purposes of the regulation, a resident is defined as an individual who **is legally domiciled within the city limits of the City of Decatur and who, on any given school day, is likely to be at their stated address when not at work or school…**A person who owns property in the City of Decatur, but does not reside in the city, is not considered a resident for purposes of enrollment…The superintendent shall be authorized to designate documents or other evidence that constitute acceptable proof of residency as part of the enrollment procedures consistent with this regulation. A school district employee may visit the address given at the time of enrollment or at any time thereafter to verify residency. The property address given must be the actual location where the student and parent, legal custodian or legal guardian are legally domiciled…

(emphasis added).

60.    Under Georgia law governing registration of a residence for electoral purposes,

A person shall not be considered to have lost such person's residence who leaves such person's home and goes into another state or county or municipality in this state, for temporary purposes only, with the intention of returning, unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence.

O.C.G.A. § 21-2-217(2).

14

61.    At no time relevant to these proceedings, did Plaintiffs cease to occupy their home in the City limits of Decatur apart from leaving their home in the normal course for temporary travel or other necessities for leaving the home with the intent to return.

62.    At no time did Plaintiffs remove their belongings from their home with the intent of relocating out of the District to establish residence elsewhere.

## G. Defendants Fish for Reasons to Remove Plaintiffs from District

63.    On September 28, 2021, CDSD Chief of Staff Courtney Burnett viewed an advertisement on Facebook of Plaintiffs' home for rent starting "September 1," and without any further investigation, directed CDSD's Registrar to "start the residency process on this."

64.    The District's Chief Information Officer, Eston Melton, searched the IP address of the location from which Plaintiffs A.B., D.B., and J.B. accessed instruction via their District-issued laptops on October 1, 2021.

65.    Melton reported to Ms. Burnett and Ms. Beam that Plaintiffs accessed instruction from out of state.

66.    The family had not taken up residence elsewhere and was temporarily out of state traveling to see family, as Assistant Superintendent Kristy Beam had previously advised DVA parents publicly that DVA was set up to allow.

67.     The family traveled out of state in reliance on District officials' prior statements that DVA was set up to allow families to travel.

68.     The family did not sign a long-term rental lease or purchase another residence out of state.

69.     Defendants made no inquiry as part of any investigation into Plaintiffs' residency regarding whether a lease had actually been signed, and never visited the home to verify who was residing there.

## H. **Defendants Remove Plaintiffs from Enrollment at CDSD without Investigation and Despite Proof That Their Residence and Permanent Domicile was in Decatur**

70.     On October 1, 2021, the District involuntarily withdrew Plaintiffs from enrollment based on an alleged violation of the residency requirement.

71.     Defendants refused to accept the proof of residency documentation provided by Plaintiffs that it typically accepted as proof of residency for enrollment purposes District-wide.

72.     Multiple other families with students enrolled in DVA were permitted by Defendants to access instruction from outside the jurisdictional boundaries of CDSD at the relevant time.

73.    By way of nonexclusive example, one family was permitted to access CDSD from Europe and another family from Mexico and this access was known to CDSD without consequence.

74.    Multiple parents whose children are enrolled in CDSD have been permitted to access instruction from outside the boundaries of Decatur and have posted about their travels while school is in session on Facebook without any consequence to their enrollment or allegation that they are in violation of the District's residency requirement.

75.    As a result of Defendants intentional and reckless acts in refusing to accept Plaintiffs' proof of residency, Plaintiffs were forced to sell their home in Decatur and move out of Decatur because Decatur refused to allow them to enroll and they maintained no other residence.

76.    Defendant Fehrman had final authority to review and approve withdrawal from enrollment decisions based on the residency requirement.

77.    After CDSD withdrew Plaintiffs from enrollment, Mr. and Mrs. Biagioni appealed to the Superintendent to reconsider the decision, including by supplying documentation that the District generally accepts as proof of enrollment from other families, but Fehrman refused to reverse the decision.

## COUNT I: FIRST AMENDMENT RETALIATION
(Against both Defendants)

78.     Paragraphs 1 through 77 above are incorporated herein by reference as if restated herein in their entirety.

79.     The First Amendment to the Constitution of the United States prohibits governmental entities from retaliating against citizens who speak and form associations to advocate, organize, and peacefully criticize the government on matters of public concern.

80.     Plaintiff April Biagioni engaged in speech protected by the First Amendment, including but not limited to multiple instances when she spoke at public Board of Education meetings, formed or associated with advocacy groups, or posted on media messages critical of Defendants, their policies, practices, and decisions.  These instances of speech and association include, but are not limited to: speech and association regarding the safe return to in-person instruction at CDSD, creating and setting up a public memorial to educators who died from COVID-19 on District property, financial impropriety by former Superintendent David Dude, and the need for transparency in the formation of Superintendent contracts by the City of Decatur Board of Education.

81.     In response to Plaintiff April Biagioni's above-pled constitutionally protected speech, Defendants subjected Plaintiffs A.B., J.B., and D.B. to retaliation

by removing them from the School District enrollment based on a residency policy that was unconstitutional. *Martinez v. Bynum*, 461 U.S. 321 (1983) (establishing constitutional requirement that to be *bona fide*, a school's residency requirement must be "appropriately defined and uniformly applied.").

82.    Defendants do not consistently apply their policy defining "Residency" in that they have permitted families other than Plaintiffs who are known to be traveling out of the District to access instruction remotely during a period of temporary travel.

83.    Plaintiff April Biagioni's above-pled constitutionally protected speech was a motivating factor in one or more of the decisions by Defendants to subject her, and the remaining Plaintiffs by association, to adverse action in their access to public education.

84.    The above-pled retaliatory acts of Defendants constitute unlawful retaliation in violation of the First Amendment to the Constitution of the United States.

85.    The actions of Defendants were taken under color of state and local law.

86.    All the retaliation complained of herein violated Plaintiffs clearly established constitutional and statutory rights, rights of which any reasonable person would have known.

87.    The actions of Defendants complained of herein were undertaken intentionally, willfully, and maliciously with respect to, or with reckless disregard for, Plaintiffs' federally protected rights.

88.    As a direct and proximate result of the above-pled retaliation in violation of the First Amendment against Plaintiffs, they have suffered out of pocket losses and have been deprived of their fundamental rights of citizen, including the right to public education.

89.    The actions of Defendants caused and will continue to cause Plaintiffs to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, loss of a free appropriate public education, and other non-pecuniary losses, all in an amount to be established at trial.

### COUNT II: VIOLATION OF PLAINTIFFS' EQUAL PROTECTION RIGHTS TO EQUAL EDUCATIONAL OPPORTUNITY AS IN-PERSON STUDENTS PURSUANT TO 42 U.S.C. § 1983
(Against both Defendants)

90.    Paragraphs 1 through 77 above are incorporated herein by reference as if restated herein in their entirety.

91.    Plaintiffs A.B., J.B., and D.B. were students of CDSD at the time of their enrollment, and in that capacity, they were entitled to public education that did not discriminate, directly or by association, against them on the basis of disability.

92.    The Equal Protection Clause of the U.S. Constitution prohibits Defendants from discriminating against Plaintiff on the basis of disability.

93.    Defendants violated Plaintiffs' rights under the Equal Protection Clause on the basis of A.B.'s disability by, *inter alia*, setting up substandard educational programming for A.B. and other children enrolled in the asynchronous Decatur Virtual Academy that substantially reduced their general education, and proportionally, special educational services without educational data supporting the appropriateness of that reduction in a manner that would still enable them to make progress on their special educational goals and objectives.

94.    Students with immune-compromising or other health conditions that made a return to in-person instruction without a mask mandate or vaccine dangerous, who then attended Decatur Virtual Academy using an asynchronous general education model, were systematically treated less favorably than similarly situated students who were able to return to school and receive a five-hour general education school day in person.

95.     In discriminating against Plaintiffs on the basis of A.B.'s asthma—a disability that prevented him (and his siblings) from returning to school in person—Defendants acted pursuant to an official policy, unofficial custom or practice, and/or decisions of final policymakers. Defendants undertook all the unlawful conduct giving rise to Plaintiffs' claims while acting under color of State, local law, regulations, customs, or usages. In addition, Defendant Fehrman acted in her individual capacity in overseeing the model used by the DVA.

96.     As a direct and proximate result of Defendants' violations of the Equal Protection Clause, Plaintiffs suffered damages including the loss of public education, financial losses related to the forced move to another school district, inconvenience, stress, and other indignities.

97.     Defendants' actions were willful, wanton, and maliciously directed to harm Plaintiffs.

98.     Alternatively, Defendants' actions were reckless and were taken in willful disregard of the probable consequences of their actions.

99.     Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause, Plaintiffs are entitled to damages in amount to be determined by the trier of fact, including compensatory damages, punitive damages against Maggie Fehrman, and

pursuant to 42 U.S.C. § 1988, attorneys' fees and costs of litigation, as well as all other relief recoverable under the Equal Protection Clause and 42 U.S.C. § 1983.

### COUNT III: VIOLATION OF DUE PROCESS, 42 U.S.C. § 1983, BASED ON CDSD'S UNCONSTITUTIONALLY VAGUE AND SELECTIVELY APPLIED RESIDENCY POLICY
(Against both Defendants)

100.   Paragraphs 1 through 77 above are incorporated herein by reference as if restated herein in their entirety.

101.   Plaintiffs A.B., J.B., and D.B. were residents of the City of Decatur, Georgia, and in that capacity, they were entitled to public education by Defendant CDSD.

102.   CDSD, and its Superintendent Maggie Fehrman acting under color of state law, deprived Plaintiffs of rights protected by the U.S. Constitution.

103.   CDSD officials have made inconsistent, confusing, and conflicting statements regarding the ability of students enrolled in the Decatur Virtual Academy to access instruction from outside of the geographical bounds of the District on a given school day, despite the language in the CDSD residency regulation.

104.   CDSD officials selectively enforce the residency policy.

105.   CDSD did not perform a bona fide investigation before involuntarily withdrawing Plaintiffs from enrollment.

106.   CDSD did not accept valid proofs of residency from Plaintiffs that it has accepted from numerous other families with respect to proving residency.

107.   The actions of CDSD, Maggie Fehrman, and CDSD's employees and agents, were in willful and wanton disregard of the rights of Plaintiffs and were done with malice.

108.   As a direct and proximate result of the actions of Defendants, Plaintiffs have been damaged in the loss of public education, financial losses related to the forced move to another school district, inconvenience, stress, and other indignities.

109.   Pursuant to 42 U.S.C. § 1983 and the Due Process Clause, Plaintiffs are entitled to damages in amount to be determined by the trier of fact, including compensatory damages, punitive damages against Maggie Fehrman, and pursuant to 42 U.S.C. § 1988, attorneys' fees and costs of litigation, as well as all other relief recoverable under the Equal Protection Clause and 42 U.S.C. § 1983.

## COUNT IV: TITLE II AMERICANS WITH DISABILITIES ACT DISCRIMINATION: REDUCTION OF SPECIAL EDUCATIONAL HOURS FOR STUDENTS WITH IMMUNE-COMPROMISING DISABILITIES
(Against CDSD only)

110.   Paragraphs 1 through 77 above are incorporated herein by reference as if restated herein in their entirety.

111.   Plaintiff A.B. was a qualified individual with a disability, asthma, who could not safely attend in-person instruction provided by Defendant CDSD,

112.   Plaintiffs J.B. and D.B. could not attend in-person instruction because of the risk of transmission of COVID-19, which they might pass to their sibling, A.B., who could experience fatal consequences if he contracted COVID-19 due to his asthma.

113. CDSD created the Decatur Virtual Academy for the ostensible purpose of enabling students with immune-compromising health conditions who were unable to attend in-person to access instruction virtually, to minimize the risk of COVID-19 transmission during the Spring of 2021 and Fall of 2021.

114.   In creating the Decatur Virtual Academy and providing community information about enrollment, CDSD officials represented that students who were unable to attend in-person due to immune-compromising qualifying disabilities would not experience a reduction in their general and special educational service hours.

25

115.   In reliance on those representations, Plaintiffs April and Mark Biagioni enrolled A.B., J.B., and D.B. in Decatur Virtual Academy.

116.   Contrary to their representations, however, CDSD reduced general education hours in the DVA to an asynchronous model (not tied to a five-hour day) in fall 2021, depriving students with qualifying disabilities (immune-compromising or respiratory conditions) who were forced to accept DVA instruction, of educational hours.

117.   In reducing the educational hours of DVA students, CDSD denied DVA students the benefits and privileges of education equal to those enjoyed by students who did not suffer from disabilities that prevented them from attending school in person.

118.   Plaintiff A.B. suffered the adverse action of an 87% reduction in his special education service hours solely because he was unable to attend in-person instruction due to his ADA-qualifying disability, asthma.

119.   Discriminatory animus may be inferred from Defendants' behavior towards Plaintiffs and other individuals with disabilities, particularly those who qualified for special education services, based on Defendant's disregard for students' need to make progress on their IEP goals and objectives despite the existence of an asynchronous school day, Defendant's false statements to Plaintiff

April Biagioni regarding who would be providing IEP services to her child, A.B., and refusal to provide accurate, timely notification to Plaintiffs and other parents regarding the service provision model and providers for students at DVA.

**COUNT V: DISCRIMINATION UNDER SECTION 504 OF THE REHABILITATION ACT: REDUCTION OF SPECIAL EDUCATIONAL HOURS FOR STUDENTS WITH IMMUNE-COMPROMISING DISABILITIES**
(CDSD only)

120.   Paragraphs 1 through 77 above are incorporated herein by reference as if restated herein in their entirety.

121.   Plaintiff A.B. was a qualified individual with a disability, asthma, who could not safely attend in-person instruction provided by Defendant CDSD.

122.   Plaintiffs J.B. and D.B. could not attend in-person instruction because of the risk of transmission of COVID-19, which they could have passed to their sibling, A.B., who could experience fatal consequences if he contracted COVID-19 due to his asthma.

123.   CDSD created the Decatur Virtual Academy for the ostensible specific purpose of enabling students with immune-compromising health conditions who were unable to attend in-person to access instruction virtually, to minimize the risk of COVID-19 transmission during the Spring of 2021 and Fall of 2021.

124.  In creating the Decatur Virtual Academy and providing community information about enrollment, CDSD officials represented that students who were unable to attend in-person due to immune-compromising qualifying disabilities would not experience a reduction in their general and special educational service hours.

125.  In reliance on those representations, Plaintiffs April and Mark Biagioni enrolled A.B., J.B., and D.B. in Decatur Virtual Academy.

126.  Contrary to their representations, however, CDSD officials reduced general education hours in the DVA to an asynchronous model (not tied to a five-hour day) in fall 2021, depriving students with qualifying disabilities (immune-compromising or respiratory conditions) who were forced to accept DVA instruction, of educational hours.

127.  In reducing the educational hours of DVA students, CDSD denied DVA students the benefits and privileges of education equal to those enjoyed by students who did not suffer from disabilities that prevented them from attending school in person.

128.  Plaintiff A.B. suffered the adverse action of an approximately 87% reduction in his special education service hours solely because he was unable to attend in-person instruction due to his ADA-qualifying disability – asthma.

129.   Discriminatory animus may be inferred from Defendants' behavior towards Plaintiffs and other individuals with disabilities, particularly those who qualified for special education services, based on Defendant's disregard for students' need to make progress on their IEP goals and objectives despite the existence of an asynchronous school day, Defendant's false statements to Plaintiff April Biagioni regarding who would be providing IEP services to her child, A.B., and refusal to provide accurate, timely notification to Plaintiffs and other parents regarding the service provision model and providers for students at DVA.

**WHEREFORE**, Plaintiffs demand a TRIAL BY JURY and, as follows:

a.  Monetary, declaratory, and injunctive relief;

b.  Judgment against Defendants on all claims;

c.  Reasonable attorneys' fees and costs; and

d.  Other and further relief as the Court deems just and proper.

Respectfully submitted on February 2, 2023.

**BUCKLEY BALA WILSON MEW LLP**

By:   */s/ Anita K. Balasubramanian*
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com

Alessandra Palazzolo
Georgia Bar No. 485399
apalazzolo@bbwmlaw.com
600 Peachtree Street, NE
Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101
*Counsel for Plaintiffs*