# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **APRIL BIAGIONI,** Individually and | ) | |
| as next friend of A.B., D.B., and J.B., | ) | |
| **MARK BIAGIONI,** Individually and | ) | |
| as next friend of A.B., D.B., and J.B., | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action File No.** |
| **v.** | ) | **1:23-cv-00514-LMM** |
| | ) | |
| **CITY SCHOOLS OF DECATUR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant City Schools of Decatur ("CSD") moves for summary judgment on Plaintiffs' sole remaining claim, showing this Honorable Court as follows:

## SUMMARY OF THE FACTS[1]

Plaintiffs April Biagioni ("Ms. Biagioni") and Mark Biagioni ("Mr. Biagioni") are the parents of the minor Plaintiffs A.B., D.B., and J.B.. During the relevant time,[2] the minor Plaintiffs were enrolled in CSD (on the basis that Mr. and Ms. Biagioni owned a home in the City of Decatur where Plaintiffs resided) until October 8, 2021, when CSD withdrew the minor Plaintiffs for violating CSD's residency policy. The minor Plaintiffs were enrolled in Decatur Virtual Academy (DVA) for the 2021-2022 school year, but Mr. and Ms. Biagioni rented out their home in the City of Decatur while Plaintiffs lived in Colorado for nearly three months from September 26 through December 17, 2021. CSD's residency policy requires that students reside in the City of Decatur and defines resident as a person "who, on any given school day, is likely to be at their stated address when not at work or school. . . . . A person who owns property in the City of Decatur, but does not reside in the city, is not considered a resident for purposes of enrollment."

On July 21, 2021, CSD received a copy of a Facebook post advertising

---

[1] CSD provides the following factual summary for the Court's convenience. CSD relies upon the facts set forth in their Statement of Undisputed Material Facts and Exhibits attached hereto filed contemporaneously herewith in support of their Motion and incorporate the same by reference as if set forth fully herein.

[2] For the purposes of this brief, references to "the relevant time" refer to March 2020 through October 2021, which includes the time period during which Plaintiffs allege Ms. Biagioni engaged in speech through the time CSD withdrew the minor Plaintiffs.

Plaintiffs' home for rent during the fall of 2021. CSD did not investigate Plaintiffs' residency at that time, as it had no information that the home had actually been rented out. However, in late September, several community members reported to Board Member James Herndon that Plaintiffs were residing out of state and another family was renting their home. Mr. Herndon relayed that information to then-Superintendent Dr. Maggie Fehrman, and CSD investigated Plaintiffs' residency.

On October 1, 2021, CSD Chief Information Officer Eston Melton searched the IP address history of the minor Plaintiffs' CSD-issued devices, which showed they had last connected to IP addresses in Colorado and California. On October 1, 2021, CSD Registrar Patrice Moore emailed a letter to Mr. and Ms. Biagioni which notified them that the minor Plaintiffs would be withdrawn on October 8, 2021, unless Plaintiffs still resided in the City of Decatur and provided updated residency documentation by that date. In response, Mr. and Ms. Biagioni confirmed both verbally and in writing that they were living in Colorado until December 17, 2021.

Although Mr. and Ms. Biagioni initially agreed to withdraw the minor Plaintiffs, they subsequently requested that the minor Plaintiffs remain enrolled, claiming they were withdrawn due to Ms. Biagioni's public advocacy. Dr. Fehrman responded and explained that CSD was investigating Plaintiffs' residency because CSD received information that another family was renting Plaintiffs' home and Plaintiffs were no longer residing there. Mr. and Ms. Biagioni did not deny this information. Nor did they provide any updated residency documents to demonstrate

that they were in fact at their City of Decatur home on any given school day when not at work or school. Mr. Biagioni then claimed the policy was ambiguous and requested that the Board of Education review Dr. Fehrman's decision. Dr. Fehrman spoke with each Board member, and they agreed that CSD's residency policy is clear and Plaintiffs were not in compliance.

Plaintiffs contend that other families traveled during the same time frame and were not investigated. But CSD investigated all reports of residency violations it received. In fact, between January 2021 and June 2023, CSD investigated twenty-six other families for residency violations and withdrew eleven. CSD withdrew the minor Plaintiffs consistent with its residency policy as it did with other families and would have done so even in the absence of Ms. Biagioni's speech.

Plaintiffs then claim they were justified in violating CSD's residency policy because CSD made statements that DVA allowed flexibility for families to travel. But CSD at no point exempted DVA families from the same residency requirements applicable to all families. Indeed, CSD communicated that residency was a prerequisite from its very first DVA informational session and reiterated that requirement multiple times before the minor Plaintiffs' withdrawal.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Summary Judgment Standard.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist." Floyd v. Sun Trust Banks, Inc., 878 F.Supp.2d 1316, 1321 (N.D. Ga. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). To prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1050 (11th Cir. 2015).

## II. Plaintiffs' First Amendment Retaliation Claim Fails as a Matter of Law.

To establish a First Amendment retaliation claim, a plaintiff must show that: (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech. Bennett v. Hendrix, 23 F.3d 1247, 1250 (11th Cir. 2005). Plaintiffs' claim fails on the third prong, as there is no evidence of a causal connection between Ms. Biagioni's speech and the withdrawal of their children from CSD. To establish a causal connection, a plaintiff must show that the defendant was **_subjectively motivated_** to take the adverse action **_because of the protected speech_**. Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197 (11th Cir. 2011) (citing Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)). Once the plaintiff shows that her

protected conduct was a motivating factor, the burden shifts to the defendant to show that it would have taken the same action in the absence of the protected speech, in which case the defendant is entitled to summary judgment. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), superseded by statute on other grounds.

## A. **No causal connection exists between Ms. Biagioni's speech and the withdrawal.**

Plaintiffs cannot point to any evidence that CSD was subjectively motivated to withdraw the minor Plaintiffs because of Ms. Biagioni's speech. The Eleventh Circuit has found the following factors relevant to causation: (1) the temporal proximity between the adverse action and the protected activity; (2) whether any reasons for the decision were pretextual; (3) whether any comments made, or actions taken, by the defendant indicate the decision was related to the protected speech; (4) whether the asserted reason for the decision varied; and (5) any circumstantial evidence of causation. Kamensky v. Dean, 148 F. App'x 878, 881 (11th Cir. 2005); Stanley v. City of Dalton, 219 F.3d 1280, 1292 n. 20 (11th Cir. 2000). Circumstantial evidence, such as a pattern of antagonism coupled with timing, may also be used to suggest a causal link. Akins v. Fulton Cnty., 420 F.3d 1293, 1305 (11th Cir. 2005). However, "[a]n inference based on speculation or conjecture is not reasonable." City of Riviera Beach v. Unnamed Gray, 649 F.3d 1259, 1272 (11th Cir. 2011), *rev'd on other grounds by* Lozman v. City of Riviera Beach, 568 U.S. 115 (2013).

Plaintiffs' claim fails on causation for three reasons: (1) CSD was unaware of

many instances of Ms. Biagioni's alleged speech; (2) there is no direct evidence linking Ms. Biagioni's thirty-plus instances of alleged speech, over 18 months, to the children's withdrawal; and (3) there is insufficient temporal proximity, and no other circumstantial evidence of causation, between Ms. Biagioni's alleged speech and the children's withdrawal. But should the Court disagree, CSD has nevertheless shown that it would have made the same decision to withdraw the minor Plaintiffs for violating the residency policy, regardless of Ms. Biagioni's protected speech.

### 1. *CSD Lacked Knowledge of Much of Ms. Biagioni's Speech.*

CSD lacked knowledge of many instances of Ms. Biagioni's speech. When a defendant is unaware of the plaintiff's speech, there can be no causal connection. Farrow v. West, 320 F.3d 1235, 1249 (11th Cir. 2003) (affirming summary judgment on a First Amendment retaliation claim where defendant had no knowledge of the plaintiff's protected activity prior to the retaliatory acts); Wall-Desousa v. Fla. Dep't of Highway Safety & Motor Vehicles, 691 F. App'x 584, 591 (11th Cir. 2017) (defendants must have actual knowledge of protected speech to show causation).

Plaintiffs identify more than thirty instances of protected speech by Ms. Biagioni over an 18-month period, between March 2020 and August 2021.[3] These include, among other things: (1) three public protests;[4] (2) several statements to the

---

[3] Ex. A, A. Biagioni 22:12-17, ex. D3 Nos. 7-8; Ex. S, Plaintiffs' Document Production Responsive to CSD's Interrogatory No. 8, PLAINTIFF000059-60.
[4] Ex. A, A. Biagioni 24:4-25:23, 29:8-31:21, 33:12-35:25, 42:1-50:14, 50:17-52:23, ex. D3 No. 7.

press;[5] (3) numerous posts to a private Facebook group;[6] (4) three petitions;[7] and (5) email communications with community groups.[8] In each of these instances, Plaintiffs cannot show that CSD knew about Ms. Biagioni's involvement in them. Plaintiffs have not produced any evidence that CSD knew at the time of the residency investigation (or subsequent withdrawal decision) that Ms. Biagioni was among the many people who attended protests against CSD, that she made statements to the press (save for one press conference),[9] that she made dozens of posts in a private "CSD Parents" Facebook group (save for six specific posts from November 12, 2020 to July 2, 2021),[10] that she sent emails to third party community groups, or that she signed petitions in March and April of 2021. Further, Ms. Moore, who was responsible for conducting the residency investigation, had no knowledge of Ms. Biagioni's speech *at all.*[11] Thus, Plaintiffs cannot credibly argue that Ms. Biagioni's speech, of which CSD had limited knowledge and Ms. Moore had no knowledge, caused the residency investigation or subsequent withdrawal.

### 2. *No direct evidence connects Ms. Biagioni's speech to the withdrawal.*

As to speech that CSD knew about, there is no direct evidence of comments or actions by CSD indicating that the withdrawal was subjectively motivated by Ms.

---

[5] Ex. A, A. Biagioni 22:12-17, ex. D3 Nos. 7, 10-11.
[6] Ex. A, A. Biagioni 22:12-17, ex. D3 Nos. 7, 8, 13.
[7] Ex. A, A. Biagioni 54:11-57:10, exs. D8, D9, D10; Ex. D, Fehrman, 99:12-23.
[8] Ex. A, A. Biagioni 22:12-17 ex. D3 No. 8.
[9] Ex. A, A. Biagioni 59:11-21.
[10] Ex. P, Fehrman Decl. ¶¶ 15-17; Ex. O, Burnett Decl. ¶¶ 13-15.
[11] Ex. R, Moore Decl. ¶¶ 18-21.

Biagioni's speech. Smith, 532 F.3d at 1278 (plaintiff must show *specifically* what motivated defendants' adverse actions). Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations in the original). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence. Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2001). Plaintiffs here allege more than thirty occasions of Ms. Biagioni's speech over the course of 18 months, apparently taking the position that her speech collectively caused the withdrawal. Plaintiffs do not demonstrate how the withdrawal is related to any specific instance of speech, much less provide direct evidence, without presumption or inference, that the speech motivated the withdrawal.[12]

### 3. *No close temporal proximity, pattern of antagonism, or other circumstantial evidence of retaliation exists.*

Temporal proximity cannot establish causation because a significant time gap exists between Ms. Biagioni's speech and the withdrawal, the only alleged act of retaliation. Temporal proximity, without more, must be "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Plaintiffs contend Ms. Biagioni's

---

[12] The text messages between Dr. Fehrman and Ms. Burnett do not constitute direct evidence, as they occurred months before the withdrawal, do not relate in any way to the withdrawal of the students, nor do they reference the withdrawal of the students. "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." Wilson, 376 F.3d at 1086.

speech began in March 2020,[13] and the last alleged instance of speech of which CSD had knowledge occurred on July 2, 2021,[14] approximately three months before the withdrawal on October 8, 2021. Three months is too remote to support an inference of causation. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (a three to four month disparity between protected expression and the adverse action is not enough); see also, Bailey v. Huntsville, 517 F. App'x 857, 861 (11th Cir. 2013) ("[A] five-month time lapse is considered too long under [the Court's] precedent").

In the absence of close temporal proximity, Plaintiffs must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism. Jones v. Suburban Propane, Inc., 577 F. App'x 951, 955 (11th Cir. 2014); Mitchell v. Parker, 271 F.Supp.3d 1364, 1380 (M.D. Ga. 2017). There is no evidence of retaliation against Plaintiffs **at any time** during the 18 months that Ms. Biagioni allegedly engaged in speech leading up to the withdrawal on October 8, 2021. Ms. Biagioni testified that Dr. Fehrman had reservations about putting her on a COVID mitigation committee that she wanted to join.[15] But Ms. Biagioni admitted that she does not recall what those "reservations" were, and she was never told that she was not placed on the mitigation committee due to her speech.[16] Moreover, Plaintiffs

---

[13] Ex. A, A. Biagioni 22:12-17, ex. D3 No. 8; Ex. S, Plaintiffs' Document Production Responsive to CSD's Interrogatory No. 8, PLAINTIFF000059-60.
[14] On July 2, 2021, Dr. Fehrman asked Ms. Burnett about the public's response to CSD's fall 2021 reopening plans. Ms. Burnett identified Ms. Biagioni as one of many parents commenting.
[15] Ex. A, A. Biagioni 128:8-129:7.
[16] Ex. A, A. Biagioni 128:8-129:7.

cannot refute that the mitigation committee was solely for medical professionals.[17]
Ms. Biagioni also claimed that Dr. Fehrman told her to remove a Facebook post.[18]
However, the record reflects that Dr. Fehrman informed Ms. Biagioni that the post
was inaccurate and asked her to correct it.[19] Neither of these incidents constitute
retaliatory action. <u>Bennett</u>, 423 F.3d at 1250 (adverse action must likely deter a
person of ordinary firmness).

Dr. Fehrman expressed concern, and on occasion frustration in private text
messages with Ms. Burnett when Ms. Biagioni disseminated misinformation to the
community.[20] There is no evidence that Dr. Fehrman took any retaliatory action
based on her frustration. In some instances, Dr. Fehrman **agreed** with Ms. Biagioni's
speech. When Ms. Biagioni publicly called for Dr. Dude to be fired, Dr. Fehrman
reacted, "me too!".[21] Most notably, these text messages occurred *months* before the
withdrawal, and there is no evidence of adverse action against Plaintiffs prior to
October 8, 2021 that would suggest an unconstitutional retaliatory motive. At best,
Dr. Fehrman's private text messages express annoyance, but annoyance does not

---

[17] Ex. D, Fehrman 182:20-184:23.
[18] Ex. A, A. Biagioni 128:1-9.
[19] Ex. A., A. Biagioni 22:12-17, ex. D3 No. 7; Ex. D, Fehrman 100:4-101:8, ex. P37.
[20] For example, in text messages in April 2021, Dr. Fehrman told Ms. Burnett she
thought Ms. Biagioni did not like her because she "called her out for lying about the
lack of supplies at the Wilson Center and Fraser Center." (Ex. D, Fehrman ex. P90
FEHRMAN-11). In March 2021, Ms. Burnett sent Dr. Fehrman a screenshot in
which Ms. Biagioni indicated that she had notified state agencies about Dr. Dude's
attendance issues, and Dr. Fehrman replied, "Doesn't she have children to care for?"
(Ex. D, Fehrman ex. P90 FEHRMAN-06—FEHRMAN-07).
[21] Ex. D, Fehrman 178:7-21, ex. P90 FEHRMAN-04—FEHRMAN-05.

equate to retaliation. See e.g., McCook v. Spriner, 44 F. App'x 896, 909 (10th Cir. 2018) ("dislike is not an illegal motive"). Further, as discussed in detail in Part III, Dr. Fehrman was not the final decision maker in this case, and the record contains no evidence that other decisionmakers (i.e., the Board) had any retaliatory intent.

## B. **CSD would have withdrawn the minor Plaintiffs regardless of Ms. Biagioni's speech.**

Even if Ms. Biagioni's speech was a motivating factor in the withdrawal decision, CSD would have nonetheless withdrawn the minor Plaintiffs because Plaintiffs violated CSD's residency policy. Once a plaintiff establishes that protected speech was a motivating factor behind the adverse action, the defendant can still prevail on summary judgment if he shows that he would have made the same decision in the absence of protected speech. Mt. Healthy, 429 U.S. 274, 285 (1977); Castle, 631 F.3d at 1197; Mosley, 532 F.3d at 1278. A "rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place [a plaintiff] in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." Mt. Healthy, 429 U.S. at 285.

Ms. Biagioni's speech does not give Plaintiffs a free pass to violate CSD's residency policy with impunity. Where a defendant can show that its alleged adverse action is due to the plaintiff's violation of law or policy, summary judgment is warranted. DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1300-01 (11th Cir. 2019). For example, in DeMartini, the plaintiff made nearly 2000 public records

requests and filed numerous lawsuits against a town. Id., at 1282-83. The town subsequently sued the plaintiff, alleging that the plaintiff's lawsuits were not for the lawful purpose of obtaining public documents but to obtain monetary settlements and attorneys' fees. Id. at 1286. The Eleventh Circuit concluded that the town had probable cause to file its suit and that the presence of probable cause was sufficient to defeat the First Amendment retaliation claim as a matter of law. Id. at 1307-08.

In the Castle case, a nursing student reported her professor for falsifying attendance records. 631 F.3d at 1198-99. The student was later suspended for violating the code of conduct and a prior warning, but she claimed the suspension was retaliation for her report. Id. The Eleventh Circuit affirmed summary judgment in favor of the defendant college, holding that the evidence demonstrated the college had a lawful motive for the suspension. Id. at 1199. See also, Williams v. Corr. Officer Radford, 64 F.4th 1185, 1195, (11th Cir. 2023) (affirming summary judgment on part of first amendment retaliation claim where defendant's action was because of plaintiff's violation of the law); Fetchick v. Seminole Cnty., 719 F. App'x 973, 974-75 (11th Cir. 2018) (plaintiff's termination was not retaliation where plaintiff committed six policy violations); Keeton v. Anderson-Wiley, 664 F.3d 865, 878 (11th Cir. 2011) (requiring plaintiff to complete a remediation plan was not retaliation, but was due to plaintiff's refusal to comply with a code of ethics).

Here, Plaintiffs violated CSD's residency policy when they moved to

Colorado for the semester and rented out their City of Decatur home.[22] The residency policy, which applied to both in-person and DVA students, required students to reside in the city limits of the City of Decatur.[23] When CSD received reports that Plaintiffs were residing out of state and were renting out their home, CSD sent a letter to Mr. and Mrs. Biagioni informing them that the minor Plaintiffs would be withdrawn from CSD on October 8, 2021, unless Plaintiffs still resided in the City of Decatur and provided updated residency documentation.[24] Contrary to Plaintiffs' contentions, the letter did not automatically withdraw the students, as it clearly stated that if Plaintiffs believed they were receiving the letter in error, they had until October 8, 2021 to provide updated residency documents. After receiving the letter, Plaintiffs admitted, both verbally and in writing, to living in Colorado from September 2021 through the end of the semester.[25]

When Mr. and Ms. Biagioni requested that the minor Plaintiffs remain enrolled in CSD, Dr. Fehrman explained that the investigation was due to information CSD received that another family was renting Plaintiffs' home while

---

[22] Ex. F, Lynch 20:21-25:14, ex. P33; Ex. A, A. Biagioni 99:8-24, ex. D4 No. 3; Ex. T, Plaintiffs' First Supplemental Responses to CSD's First Requests for Production of Documents, No. 4; Ex. W, Plaintiffs' Document Production Responsive to CSD's Request to Produce No. 4, PLAINTIFF000515-529.

[23] Ex.. F, Lynch 45:17-46:3; Ex. N, Beam Decl. ¶ 22; Ex. D, Fehrman 116:21-117:22.

[24] Ex. E, Herndon 29:5-33:7; Ex. I, Herndon Decl. ¶ 3; Ex. H, Moore 123:20-124:5, ex. P57; Ex. R, Moore Decl. ¶ 11, att. 2.

[25] Ex. A, A. Biagioni 101:7-103:5; Ex. H, Moore 123:20-128:1, ex. P58; Ex. B, M. Biagioni 44:16-45:11, 88:24-90:10, ex. D21 (emphasis added); Ex. D, Fehrman 131:17-133:25, 138:4-13, 139:24-142:3, 143:9-19, 149:18-150:23, ex. P61;

Plaintiffs were not residing there.[26] Plaintiffs cannot rebut this information, nor do they dispute that they were in Colorado while their home was leased from September 26 through December 17, 2021.[27] Like the plaintiffs in <u>DeMartini</u> and <u>Castle</u>, Plaintiffs here violated a clear policy, and CSD had a lawful reason, unrelated to Ms. Biagioni's speech, for the withdrawal. Ms. Biagioni's speech should not place Plaintiffs in a better position with regard to the policy violation than they would have occupied absent the speech. <u>Mt. Healthy</u>, 429 U.S. at 285.

CSD would have made the same decision absent Ms. Biagioni's speech. CSD also withdrew numerous other students for residency violations during the same time frame. Between January 2021 and June 2023, CSD received and investigated twenty-six other reports of residency violations – eleven were substantiated and the students were withdrawn, eleven were unsubstantiated, and four involved students who remained enrolled as required by the McKinney-Vento Act.[28] [29]

Plaintiffs claim they should have been allowed to remain enrolled because they believed the residency policy was "ambiguous" and selectively enforced.

---

[26] Ex. D, Fehrman 152:10-153:21, ex. P63.

[27] Ex. A, A. Biagioni 99:8-24, ex. D4 No. 3; Ex. T, Plaintiffs' First Supplemental Responses to CSD's First Requests for Production of Documents, No. 4; Ex. W, Plaintiffs' Document Production Responsive to CSD's Request to Produce No. 4, PLAINTIFF000515-529.

[28] Ex. O, Burnett Decl. ¶ 31, atts. 2-4; Ex. F, Lynch 23:12-24:14, ex. P97.

[29] "Upon determining that a student is homeless, as defined by the McKinney-Vento Homeless Assistance Act, the child must be allowed to either remain in the district in which he or she was enrolled prior to becoming homeless or enroll in the district where he or she is now located." Ga. Comp. R. & Regs. r. 160-5-1-.28(2)(b)(i)(I).

Plaintiffs rely on Facebook posts by families who were purportedly traveling on school days but were not investigated.[30] However, the evidence shows that CSD was not aware of or ever notified of any of these families' alleged travels.[31] These Facebook posts were made on individuals' private Facebook pages and there is no evidence that any official at CSD ever saw them.[32, 33] Had these alleged violations been reported at the time, CSD would have investigated them just like it investigated Plaintiffs' reported violation and every other report it received.[34]

### C. Plaintiffs' reliance on statements about DVA is belied by the evidence.

Plaintiffs attempt to justify their violation of the residency policy, contending that they relied on statements made by CSD officials that DVA would provide "flexibility" for families that travel.[35] This argument is unavailing. It is undisputed that CSD's residency policy applied to both in-person students and DVA students.[36] Plaintiffs claim to have relied on the information from a recorded DVA Information Session on April 14, 2021, in which Dr. Beam allegedly stated that DVA would allow "flexibility" to accommodate "frequent travel."[37] Not only was no such statement

---

[30] Ex. A, A. Biagioni 106:6-24, 154:24-167:14, ex. D18.
[31] Ex. C, Burnett 214:14-228:22, ex. D18.
[32] Ex. A, A. Biagioni 106:6-24, 154:24-167:14, ex. D18.
[33] Moreover, many of the posts appear to have been made on or around holidays or school breaks, or it is unclear when the pictures were actually taken versus when they were posted to Facebook. Ex. C, Burnett 212:25-228:22, ex. D18.
[34] Ex. C, Burnett 220:22-25.
[35] Ex. A, A. Biagioni 22:12-17, ex. D3 No. 19.
[36] Ex.. F, Lynch 45:17-46:3; Ex. N, Beam Decl. ¶ 22; Ex. D, Fehrman 116:21-117:22.
[37] Ex. A, A. Biagioni 83:10-15, ex. D3 No. 19.

made by Dr. Beam,[38] but that same meeting contained a "Frequently Asked Questions" ("FAQ") portion which further emphasized the residency requirement for DVA: "[Q:] …To be a part of DVA students must still reside in 30030? . . . [A:] *DVA will only be available to City of Decatur residents* and our courtesy tuition students."[39] Additionally, shortly before the 2021-2022 school year, DVA sent its first newsletter to DVA families which included a linked DVA FAQ document that also reiterated the residency requirement: "[Q:] How do I get into the DVA? [A:] DVA enrollment *is subject to Decatur residency* …".[40] This same FAQ document was linked in five more weekly DVA newsletters through August 26, 2021.[41]

Plaintiffs also assert that they relied on a slide presentation from a DVA Advisory Team meeting in May 2021.[42] However, the presentation was actually a *parent proposal* that made recommendations for DVA, which was neither created nor adopted by CSD.[43] As a member of the Advisory Team,[44] Ms. Biagioni was well aware that this presentation did not represent CSD's position; therefore, any purported reliance on this presentation was patently unreasonable.

Next, Plaintiffs contend that they relied on a statement at a Board meeting on

---

[38] Ex. N, Beam Decl. ¶ 7, https://www.youtube.com/watch?v=O2y7sA1kqtg.
[39] Ex. N, Beam Decl. ¶ 5, https://www.youtube.com/watch?v=O2y7sA1kqtg at 18:32 (emphasis added).
[40] Ex. N, Beam Decl. ¶ 18, att. 4, att. 5 CSD-01049 .
[41] Ex. N, Beam Decl. ¶ 19, atts. 5-6.
[42] Ex. A, A. Biagioni 83:10-15, ex. D3 No. 19.
[43] Ex. A, A. Biagioni 84:5-22, 168:23-169:7, ex. D19; Ex. F, Lynch 61:16-62:4, 82:1-23, ex. D99; Ex. N, Beam Decl. ¶ 12, att. 1 CSD-01006, att. 2.
[44] Ex. A, A. Biagioni 79:21-80:12, 81:10-15.

May 11, 2021, in which Dr. Beam explained that DVA would be an option for not only COVID-concerned families, but also other families "such as sports and film families that frequently need to travel for extended periods," among others.[45] But Dr. Beam's statement referred to extensions of a break or weekend.[46] Dr. Beam never stated that families could travel long-term, rent out their home, and remain in DVA.[47]

Ironically, at this very same meeting, Board Member Lewis Jones reiterated the CSD residency policy: "schools are for Decatur City residents and residents are those who put their head on a pillow inside the Decatur City limits most nights."[48] Mr. Jones made this statement while proposing a change to the residency policy to allow residents undergoing home renovations to temporarily live outside the district. In the context of that discussion, Mr. Jones explained that renting out one's home while renovating **would not be permitted**.[49] In sum, the undisputed evidence shows that CSD explicitly communicated its residency requirement to DVA families on multiple occasions, and *no exception* was made for families to travel long-term or to rent their home while attending CSD. Plaintiffs cannot credibly argue that they were allowed to live in Colorado while renting out their Decatur home and attending DVA.

---

[45] Ex. A, A. Biagioni 82:5-25, ex. D3 No. 19.

[46] Ex. N, Beam Decl. ¶¶ 14-15; Ex. F, Lynch 50:9-51:20.

[47] Ex. N, Beam Decl. ¶¶ 11, 16, 22; Ex.. F, Lynch 45:17-46:3, 54:6-16; Ex. D, Fehrman 116:21-117:22.

[48] Ex. Q, Melton Decl. ¶ 13, https://www.youtube.com/watch?v=Nrd0vq9cfTo at 2:49:26.

[49] Ex. Q, Melton Decl. ¶ 13, https://www.youtube.com/watch?v=Nrd0vq9cfTo at 2:51:15.

Moreover, the timeline of events shows that Plaintiffs did not **actually** rely on any representations about DVA. Ms. Biagioni had already advertised Plaintiffs' home for rent at least two weeks before any of the alleged representations about DVA. On March 28, 2021, Ms. Biagioni advertised Plaintiffs' home for rent from June through September 2021, a time period which included the first two months of the school year, which began August 3, 2021.[50] Clearly, as of March 28, 2021, Plaintiffs intended to rent their home for months, while school was in session. Yet the first purported representation about DVA's "flexibility" for travel was not made until two weeks later on April 14, 2021. Thus, Plaintiffs did not rely on alleged statements about flexibility to travel in making the decision to rent their home.

## III. The Evidence Does Not Support <u>Monell</u> Liability Under Section 1983.

In addition to the elements of a First Amendment retaliation claim, all plaintiffs who sue a municipality under Section 1983 must show that the municipality had a policy or custom that caused the alleged constitutional violation. <u>Monell v. Dep't of Soc. Servs. of New York</u>, 436 U.S. 658, 694-95 (1978) (holding that municipalities may not be held liable on a theory of respondeat superior). A plaintiff may establish <u>Monell</u> liability in three ways: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so

---

[50] Ex. T, Plaintiffs' First Supplemental Responses to CSD's First Requests for Production of Documents, No. 5; Ex. X, Plaintiffs' Document Production Responsive to CSD's Request to Produce No. 5, PLAINTIFF000691; Ex. P, Fehrman Decl. ¶ 11, att. 1 CSD-06475.

permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty. Fla., 48 F.4th 1222, 1229 (11th Cir. 2022). Next, a plaintiff must show causation by ultimately proving that the policy or custom was the "driving force" behind the constitutional violation. Monell, 436 U.S. at 690-95. "The bar to establish municipal liability is very high." Simmons v. Bradshaw, 879 F.3d 1157, 1169 (11th Cir. 2018).

Here, Plaintiffs seek to establish Monell liability under a final policymaker theory,[51] but there is no evidence that the final policymaker (in this case the Board) adopted or ratified an unconstitutional motive.

---

[51] Plaintiffs have never alleged that CSD had an official policy of targeting critics or permitting First Amendment retaliation, nor have they identified such a policy. And no such policy exists. See Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (an official policy refers to one enacted by the municipality's legislative body). The policy central to this case is CSD's residency policy, which is wholly unrelated to speech and does not base residency decisions on speech. Similarly, Plaintiffs have not alleged a persistent pattern of First Amendment violations, nor have they produced evidence of other First Amendment violations by CSD. See Khoury v. Miami-Dade Cnty. Sch. Bd., 4 F.4th 1118, 1131 (11th Cir. 2021) (a municipal custom requires evidence of "persistent unconstitutional conduct so pervasive and widespread as to be the functional equivalent of a policy adopted by the final policymaker."). Here, Plaintiffs' claim is predicated entirely on their single alleged incident of First Amendment retaliation which, as a matter of law, is insufficient to show a custom having the force of official policy. See generally, Doc. 15; Torres-Bonilla v. City of Sweetwater, 805 F. App'x 839, 840 (11th Cir. 2020).

A. **Plaintiffs cannot establish *Monell* liability under a final policymaker theory.**

Under a final policymaker theory, a plaintiff must show that an official with final, non-reviewable policymaking authority for the challenged action or policy either approved or implemented the unconstitutional action at issue. Scala v. Winter Park, 116 F.3d 1396, 1399-1403 (11th Cir. 1997) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1896)). Plaintiffs assert that "[Dr.] Fehrman had final authority to review and approve withdrawal from enrollment decisions based on residency" and that she "refused to reverse" the withdrawal decision. [Doc. 15 ¶¶ 80, 82]. However, Plaintiffs ignore the undisputed fact that the Board reviewed Dr. Fehrman's decision in this case, and there is no evidence that any of the Board members adopted or ratified an unconstitutional motive.

1. *The Board was both the final policymaker and final decision maker.*

"To determine if someone is a final policymaker, courts look not only to state and local positive law, but also custom and usage having the force of law." Holloman ex re. Holloman v. Harland, 370 F.3d 1252, 1291 (11th Cir. 2004). In Georgia, each local school system is managed and controlled by a board of education. Ga. Const., Art. VIII, § 5, ¶ ii. Local boards of education are charged with establishing policy for the local school system, while local superintendents are the executive officers of the local school board and are charged with implementing board policy. Ga. Const., Art. VIII, § 5, ¶ iii; O.C.G.A. § 20-2-61.

CSD does not dispute that, as Superintendent, Dr. Fehrman was authorized to

implement and enforce CSD's residency policy. Indeed, Dr. Fehrman testified that she designated Ms. Burnett to carry out the policy but that she had the authority to override a decision.[52] However, the analysis does not end there. The question of whether a public official acted as a final policymaker with respect to a particular decision also turns on the specific facts. <u>Mandell v. Doe</u>, 888 F.2d 783, 792-93 (11th Cir. 1989) (noting that though "identification of the final policymaker may often involve fact-sensitive inquiries," it is a question properly decided by the courts); <u>Williams v. Fulton Cnty. Sch. Dist.</u>, 181 F. Supp. 3d 1089, 1127 (N.D. Ga. 2016) ("[D]etermining who is a final policymaker is a question of law, but it depends intensely on the facts of the case, and requires consideration of both positive law and local custom."). Here, the facts show that Dr. Fehrman did not act as the sole and final policymaker with respect to the withdrawal decision. Rather, the Board did, by reviewing Dr. Fehrman's decision and agreeing with it.

First, the record shows that both Ms. Burnett and Dr. Fehrman mutually agreed that the minor Plaintiffs should be withdrawn from CSD.[53] Next, on October 4, 2021, Plaintiffs emailed Dr. Fehrman, arguing among other things that their withdrawal "seem[ed] retaliatory for [Ms. Biagioni's] public advocacy on school issues."[54] Dr. Fehrman responded on October 5, 2021, articulating the reasons for

---

[52] Ex. D Fehrman 57:2-5, 60:2-61:11.
[53] Ex. D, Fehrman 108:17-109:2, 118:2-119:1; Ex. C, Burnett, 203:7-21, 217:21-25; Ex. O, Burnett Decl. ¶¶ 29-30; Ex. P, Fehrman Decl. ¶ 32-35.
[54] Ex. B, M. Biagioni 44:16-45:11, 88:24-90:10, ex. D21; Ex. D, Fehrman 131:17-133:25, 138:4-13, 139:24-142:3, 143:9-19, 149:18-150:23, ex. P61.

the residency investigation, but noting that Plaintiffs had until October 8, 2021 to provide evidence to the contrary.[55] Plaintiffs did not.[56]

Finally, on October 10, 2021, Mr. Biagioni asked Dr. Fehrman to have the Board review both the withdrawal decision and the residency policy for ambiguity.[57] Dr. Fehrman spoke to each Board member regarding "the information that we looked into, the information that we had gathered regarding what we knew about [Plaintiffs'] current residence in Colorado, what was happening with their [home], and that [Plaintiffs'] request was to review the policy as well as [their] appeal to keep the students enrolled."[58] The individual Board members had also received and read the emails between Plaintiffs and CSD staff requesting reconsideration of the withdrawal decision.[59] Each Board member agreed with the withdrawal decision based on Plaintiffs' residency policy violation and agreed that the residency policy was clear.[60] On October 12, 2021, Dr. Fehrman informed Plaintiffs via email (and copied all Board members), that the Board agreed the residency policy was unambiguous and that Plaintiffs did not "meet the residency requirement to remain

[55] Ex. D, Fehrman 152:10-153:21, ex. P63.
[56] Ex. B, M. Biagioni 45:12-46:4, ex. D21.
[57] Ex. B, M. Biagioni 49:7-50:1, 90:19-91:16, ex. D22, ex. D23; Ex. D, Fehrman 162:23-164:17, ex D22; Ex. P, Fehrman Decl. ¶¶ 36, 38, att. 5.
[58] Ex. D, Fehrman 166:2-15.
[59] Ex. E, Herndon 109:10-110:23, ex. D101; Ex. J, Johnson-Davis Decl. ¶ 3, att. 1; Ex. K, White Decl. ¶ 3, att. 1; Ex. L, Jones Decl. ¶ 3, att. 1; Ex. M, Tell Decl. ¶¶ 3-4, att. 1.
[60] Ex. D, Fehrman 165:18-168:4, ex. D23; Ex. E, Herndon 112:3-113:7, 115:9-119:4; Ex. J, Johnson-Davis Decl. ¶ 6; Ex. K, White Decl. ¶ 6; Ex. L, Jones Decl. ¶¶ 4, 6, att. 1; Ex. M, Tell Decl. ¶ 5, att. 1.

enrolled at CSD schools, including [DVA]."[61]

Based on the foregoing facts, Dr. Fehrman's decision was neither final nor non-reviewable. Therefore, the Board, not Dr. Fehrman, was the final policymaker.

### 2. *Plaintiffs cannot show that the Board ratified an unconstitutional motive.*

Plaintiffs cannot demonstrate that the Board ratified an unconstitutional motive. "Ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who [has] final policymaking authority." Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002); see also Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016). The final policymaker (here, the Board) must not only ratify the decision but must also ratify or adopt the unconstitutional basis for the decision as their own. Garvie v. City of Ft. Walton Beach, 366 F.3d 1186, 1189 (11th Cir. 2004). Having knowledge of a subordinate's unconstitutional motive is insufficient for ratification. Matthews, 294 F.3d at 1298 (A "lawmaker who votes for…legislation – even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote – does not automatically ratify or endorse the unconstitutional motive."). Instead, Plaintiffs must demonstrate deliberate conduct by CSD "**taken with the requisite degree of culpability.**" 625 Fusion, LLC v. City of Fort Lauderdale, 526 F. Supp. 3d 1253, 1262 (S.D. Fla. 2021) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520

---

[61] Ex. D, Fehrman 165:18-168:4, ex. D23.

U.S. 397, 404 (1997) (emphasis added)).

Here, there is no evidence showing that the Board had the state of mind necessary to prove a constitutional violation. Plaintiffs identified Mr. Herndon as the only Board member who retaliated against them by not reversing Dr. Fehrman's decision.[62] The record contains no evidence that Mr. Herndon had a retaliatory motive, but assuming *arguendo* that he did, a retaliatory motive by one board member is insufficient to establish that other members shared the same retaliatory motive. Lozman v. City of Riviera Beach, 39 F. Supp. 3d 1392, 1403 (S.D. Fla. 2014) (Where "a policy maker is comprised of a public body consisting of multiple board members, a majority of the members of the council constitutes a final policymaker for purposes of creating Monell liability."); see Campbell v. Rainbow City, 434 F.3d 1306, 1313 (11th Cir. 2006) (an improper motive of one board member is not automatically imputed to the rest of the board); Mason v. Vill. of El Portal, 240 F.3d 1337, 1339 (11th Cir. 2001) (granting summary judgment where only one member of a three-member majority had voted to fire plaintiff for a discriminatory reason).

The Board's knowledge of Plaintiffs' allegations of retaliation is also insufficient to show ratification of an unconstitutional motive. Plaintiffs' accusations are merely opinion and conjecture. At best, they demonstrate Plaintiffs' **belief** that the withdrawal was unconstitutional, but they do not establish ratification or adoption of an unconstitutional motive by the Board. Fedderman v. Palm Beach

---

[62] Ex. A, A. Biagioni 119:20-120:7, 124:4-126:24.

<u>Cnty. Sch. Bd.</u>, No. 9:22-cv-81857-DMM, 2024 WL 654668, at *41-*44 (S.D. Fla. Feb. 15, 2024) (evidence that plaintiff informed the board of her belief that an employment action was First Amendment retaliation prior to their approval vote is not sufficient evidence that the board agreed with an unconstitutional motive).

### B. **<u>Plaintiffs cannot show that a CSD policy or custom was the driving force behind their alleged injury.</u>**

Plaintiffs cannot show causation necessary to establish <u>Monell</u> liability. Plaintiffs have never provided any evidence refuting the findings of the residency investigation (i.e., the rationale for withdrawal). Plaintiffs' own conduct is an intervening act of misconduct which breaks any causal connection between Ms. Biagioni's speech and the withdrawal. <u>See e.g.</u>, <u>Hankins v. AirTran Airways, Inc.</u>, 237 F. App'x 513, 521 (11th Cir. 2007) (rejecting an employment retaliation claim where an intervening act of misconduct severed the causal connection (if any) between the plaintiff's initial discrimination complaint and the defendant's decision to terminate her); <u>Davis v. United States</u>, 272 F. 1 863 (11th Cir. 2008) (holding there was no causal connection between an inmate's complaints and an incident report that was filed against him when the inmate was not following orders). For these reasons, Plaintiffs cannot show that any municipal policy or custom **caused** the alleged constitutional violation as required for Section 1983 liability.

### IV. **Conclusion.**

For the reasons set forth above, CSD respectfully requests that the Court GRANT its Motion for Summary Judgment.

Respectfully submitted this 13th day of October, 2025.

|  |  |
|---|---|
|  | */s/ Jill T. Young* |
| Wilson, Morton & Downs, LLC | Jill T. Young |
| Two Decatur TownCenter | Georgia Bar No. 367039 |
| 125 Clairemont Ave., Suite 420 | Keri P. Ware |
| Decatur, GA 30030 | Georgia Bar No. 737751 |
| (404) 377-3638 | Laura L. Moore |
| jyoung@wmdlegal.com | Georgia Bar No. 870394 |
| kware@wmdlegal.com |  |
| lmoore@wmdlegal.com |  |

## <u>CERTIFICATE OF COUNSEL REGARDING FONT SIZE</u>

Counsel certifies that the foregoing has been prepared using Times New

Roman font size 14 in accordance with Local Rules 5.1(B)(3) and 7.1(D).

This 13th day of October, 2025.

*/s/ Jill T. Young*
Jill T. Young
Georgia Bar No. 367039
