# IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| **APRIL BIAGIONI,** Individually and as next friend of A.B., D.B., and J.B., **MARK BIAGIONI,** Individually and as next friend of A.B., D.B., and J.B., | ) ) ) ) ) | |
| **Plaintiffs,** | ) | Civil Action File No. |
| v. | ) | 1:23-cv-00514-LMM |
| | ) | |
| **CITY SCHOOLS OF DECATUR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS APRIL AND MARK BIAGIONI'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**BUCKLEY BALA WILSON MEW LLP**

*/s/ Anita K. Balasubramanian*
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
Kathleen Kacynski
Georgia Bar No. 587883
kkacynski@bbwmlaw.com
201 17th St. NW
Suite 630
Atlanta, GA 30363
Telephone: (404) 781-1100
Facsimile:(404) 781-1101

Counsel for Plaintiffs

**December 1, 2025**

**LEGARE ATTWOOD & RAGAN LLP**

*/s/ Cheryl Legare*
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@law-llc.com
Two Decatur Town Center
125 Clairemont Avenue, Suite 515
Decatur, Georgia 30030
Phone: (470) 823-4000
Fax: (470) 201-1212

It is undisputed in this First Amendment retaliation case that Plaintiff April Biagioni was a "frequent critic" of the District, that the CSD Superintendent Maggie Fehrman and residency decisionmaker, Courtney Burnett, often mocked Ms. Biagioni for engaging in protected activity, and that CSD applied its residency policy in *ad hoc* and selective ways. CSD purposely omits substantial comparator evidence showing numerous examples where it treated similarly situated students whose parents were not vocal or frequently critical, more favorably. Then, for the first time at summary judgment, CSD changed the identity of its final decisionmaker to the Board of Education, omitting evidence of the Board's norms and witness testimony denying Board involvement in the residency decision, and attaching sham declarations, to undercut the abundant evidence of Maggie Fehrman and Courtney Burnett's retaliatory animus. For all the reasons that follow, this Court should deny Defendant's Motion for Summary Judgment and allow this case to proceed to a jury.

## I.    Mr. and Mrs. Biagioni Raise Genuine Issues of Material Fact

Plaintiffs incorporate herein their Responses and Objections to Defendant's Statement of Facts and their Statement of Additional Material Facts Raising Genuine Issues to be Tried.

## II.    CSD violated Plaintiffs' First Amendment rights.

The Eleventh Circuit has set out three requirements to state a First Amendment retaliation claim: "(1) [the plaintiff] engaged in [] protected speech…;

(2) [adverse effect on speech]; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech. Huggins v. Sch. Dist. of Manatee Cty., 151 F.4th 130-98 (11th Cir. 2025)). Defendant disputes only the causal connection prong. [Dkt. 120-30 at 5.] Ms. Biagioni's copious record of protected speech, the many instances of contempt shown by City Schools of Decatur's ("CSD") officials to her protected speech, as well as the numerous examples of similarly situated comparators without a record of protected speech treated more favorably than Plaintiffs, demonstrate the retaliatory animus of CSD, which it acted upon at its first opportunity.

A.  **There is significant evidence of a causal link between Plaintiffs' protected activity and Defendant's withdrawal of the children.**

Defendant argues that the purported absence of temporal proximity between Plaintiffs' protected speech and the withdrawal decision undermines the causal connection. [Dkt. 120-30 at 6.] Even in the absence of temporal proximity, however, a plaintiff can demonstrate causation with other evidence, "such as a pattern of antagonism or that the adverse action was the first opportunity for the [defendant] to retaliate." Joyner v. City of Atlanta, No. 1:16-cv-01780-TWT-LTW, 2019 U.S. Dist. LEXIS 238793, at *33 (N.D. Ga. Sep. 13, 2019) (citing Jones v. Suburban Propane, Inc., 577 F. App'x 951, 955 (11th Cir. 2014). "A pattern [of antagonism] can be established by showing "heightened scrutiny, negative criticism, differential treatment or violation of standard internal protocol and procedures." Taylor v.

Cardiovascular Specialists, P.C., No. 11-4521-TCB-RGV, 2013 U.S. Dist. LEXIS 186090, at *98 (N.D. Ga. Dec. 11, 2013), *report and recommendation adopted*, Taylor v. Cardiovascular Specialists, P.C., 4 F. Supp. 3d 1374, 1383 (N.D. Ga. 2014). "The Court considers evidence of temporal proximity in conjunction with other evidence of retaliation when determining on summary judgment whether 'the totality of the evidence establishes that there is a genuine dispute of material fact.'" Highsmith v. CSX Transp., Inc., No. 5:22-CV-52, 2024 U.S. Dist. LEXIS 114983, at *16 (S.D. Ga. June 24, 2024) (citing Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 130-91, 1270-76 (11th Cir. 2017).

Moreover, the "first opportunity to retaliate" doctrine

allows a plaintiff to prove the causation element…despite a temporal gap sufficient to prevent a finding that the protected activity and the retaliatory conduct have some causal connection—if the plaintiff can show that the defendant had no earlier opportunity to retaliate and that the evidence shows the events are not completely unrelated."

Rose v. Wal-Mart Stores E., Inc., No. 2:13-cv-1080-JHH, 2015 U.S. Dist. LEXIS 35479, at *22 (N.D. Ala. Mar. 23, 2015). **There is evidence of all four aspects of a pattern of antagonism here: heightened scrutiny, negative criticism, differential treatment, and a violation of standard internal protocol and procedures**. There is also evidence that CSD withdrew the children at their first opportunity; although Dr. Fehrman and Ms. Burnett privately mocked Ms. Biagioni for her public advocacy, they could do nothing about it for several months other than

to directly ask her to refrain from sharing her ideas, since public school district enrollment in Georgia is not "at-will." Ga. Const. art. VIII, § 1.

1. **Defendant showed a pattern of antagonism in the months leading up to the children's withdrawal from enrollment.**

    a. **Negative Criticism**: CSD's disparagement of Ms. Biagioni.

Defendant claims that it was "unaware of Ms. Biagioni's speech," which is patently false. [Dkt. 120-30 at 6.] In the months leading up to the withdrawal of the Plaintiffs' children in October 2021, Ms. Burnett and Dr. Fehrman privately disparaged her in petty, malicious ways directly related to her speech. Indeed, Ms. Burnett readily admitted that Mrs. Biagioni was a "frequent critic" of the District. [Dkt. 130-6 at 184:13-18.] Dr. Fehrman and Ms. Burnett were aware of at least six Facebook posts Ms. Biagioni made on the "CSD Parents" group. [Dkt. 120-2 at ¶ 41.] That said, CSD claims that Patrice Moore, who performed the residency investigation of Plaintiffs, was not aware of Ms. Biagioni's speech. [Dkt. 120-30 at 6.] This fact is immaterial, however, because CSD admits Ms. Moore only commenced her investigation at the direction of Ms. Burnett and Dr. Fehrman. [Dkt. 120-2 at ¶¶ 129-130.] And, when Plaintiffs submitted proof of residency on October 4, 2021, they did so by email directly to Dr. Fehrman. [Dkt. 130-8 at pp. 179-182 (Ex. D101) (CSD00098-101).]

At the **January 12, 2021 Board of Education meeting**, Ms. Biagioni criticized CSD for failing to provide personal protective equipment to staff at the

CSD early childhood learning center, forcing the lowest paid staff to buy their own masks, having a broken HVAC system, not providing hazard pay, and not treating staff with respect.[1] Then-Superintendent David Dude denied that there was no PPE, called her claims inaccurate, and responded by asking personnel to talk to District officials, not community members who "stir[] things up."[2] Dr. Fehrman and Ms. Burnett texted each other about Mrs. Biagioni during her public comments. [Dkt. 130-6 at 530 (BURNETT-03) ("Well we have found the person talking to April B at College Heights.")] When Dr. Dude called Mrs. Biagioni's claims untrue, Dr. Fehrman texted Ms. Burnett, "Oh shit!! He just called AB a liar!" [Id.]

On **March 12, 2021**, Ms. Burnett and Dr. Fehrman exchanged messages that included a screenshot of a Facebook post where community members were discussing voting Defendant's Board out of office in the wake of allegations against Dr. Dude for misuse of leave time. [Dkt. 130-6 at 253:1-24; id. at 533 (Ex. P102); Dkt. 130-7 at 20:2-21:1 (discussing allegations against Dude).]  Ms. Biagioni commented that Dr. Dude was reported to various government agencies. [Id.; Dkt. 130-6 at 253:1-24; id. at 533 (Ex. P102).] Dr. Fehrman sent a screenshot to Ms. Burnett of Mrs. Biagioni's comment specifically, asking, "What is April talking about?" [Dkt. 130-6 at 533 (Exhibit 102, Burnett-06).]  Ms. Burnett responded, "She

---

[1] Dkt. 120-19 at ¶ 10 (https://www.youtube.com/watch?v=exg8uwUIBko at 1:13:58-1:16:45.
[2] Id. at 1:58:39-1:59:48.

has apparently made the doe [referring to the Georgia Department of Education], AG's office and Dept of labor aware of [crown emoji]'s work schedule." [*Id.*] The "crown emoji" referred to Dr. Dude. [Burnett Dep., Dkt. 130-6 at 253:20-24.] Dr. Fehrman responded to Ms. Burnett's text message stating, "Lord.  Doesn't she have children to care for?" [Dkt. 130-6 at 533 (P102).]

On **April 22, 2021**, Dr. Fehrman texted Ms.  Burnett, "April B tried to zoom bomb the mitigation team meeting tonight. [Dkt. 130-7 at 379 (Ex. P90).] Ms. Burnett responded, "Seriously? She needs a hobby." [Id.] Dr. Fehrman replied, "Right!!!! Heard she's already out on Facebook trying to get Dan involved," referring to Dan Whisenhunt of the *Decaturish* news outlet. [Id. at 182:25-183:1; Id. at 379 (Ex. P90).]

On **June 29, 2021**, Mrs. Biagioni made a Facebook post criticizing the District's modified quarantine plan during COVID. [**Ex. A**, April Biagioni Decl. at ¶ 21, att. A-7.] In follow up, Ms. Biagioni posted again on **July 2, 2021**, stating, "Sorry me again, but if you want an unbiased panel for the Superintendents Q&A Townhall regarding the "modified quarentine [sic]" let the district know bc many of the public health experts haven't been invited to participate." See id. at ¶ 22 att. A-8. Defendant admits seeing Ms. Biagioni's July 2, 2021 post. [Dkt. 120-2 at ¶ 41.]

On **July 2, 2021**, Dr. Fehrman texted Ms. Burnett, asking, "Are people going nuts on social media? I got a few thank you emails." [Dkt. 130-6 at 539.]  Ms. Burnett

responded, "The typical people are losing their minds...I think most are completely missing the point that Covid positive people will not be given the choice to not isolate...." [Id.] Dr. Fehrman responded to Ms. Burnett stating, "Which parent? Camp or Ravioli?" [Id.] Burnett responded, "…Camp, Biagioni, Peavey and Tara Shannon are the main ones commenting." [Id.] When referring to the "typical people," Ms. Burnett was referring to the people who "commented the most." [Dkt. 130-6 at 261:6-11.] Defendant claims that Fehrman and Burnett's "frustration" with Ms. Biagioni arose because of alleged concerns she was spreading misinformation [Dkt. 120-30 at 11], but the veracity or even the reasonableness of private citizen First Amendment speech is not material to whether such speech is protected. Young v. Am. Mini Theatres, 427 U.S. 50, 63-64 (1976) (["…nor may speech be curtailed because it invites dispute, creates dissatisfaction with conditions the way they are, or even stirs people to anger.") Instead, construing inferences in Plaintiffs' favor, a jury could interpret CSD's "frustration" as retaliatory animus.

### b.  Heightened Scrutiny and Differential Treatment

#### 1.  Special electronic surveillance used only on the Biagionis

CSD applied its residency policy in *ad hoc* and inconsistent ways. For Plaintiffs, Defendant used electronic surveillance tools it has not used in any other case and refused to accept typical proofs of residency that it accepted in other cases. Eston Melton testified that the Biagioni children were the only students for whom

he has ever been involved in a residency investigation and that he had never performed an IP address search of any other student for residency purposes. [Dkt. 130-12 at 109:1-21.] There was no system or process to track IP addresses and locations of DVA families generally. [Dkt. 130-9 at 19:12-19, 20:12-19.]

On October 4, 2021, before the October 8th deadline provided in CSD's residency withdrawal letter, Plaintiffs emailed Dr. Fehrman and other officials a copy of the family's utility bill and a property tax receipt, both of which showed ██ ██████████ in Decatur as Plaintiffs' address. [Dkt. 130-8 at 179-182 (Ex. D101).] Additionally, the ████████████. Decatur property is where Plaintiffs received a homestead exemption, which CSD uses to determine the primary residence if a family has multiple residences. [April Biagioni Decl. ¶ 28; Dkt. 120-2 at ¶ 24.] Property records and utility bills are acceptable proofs of residency, according to Patrice Moore. [Dkt. 130-13 at 26:18-19, 28:18-20, 36:7-12.] Even though Plaintiffs sent the property tax receipt and utility bill to Dr. Fehrman on October 4, 2021, CSD refused these attachments as proof of residency. [April Biagioni Decl. ¶ 29.]

2.    Differential treatment of the Biagionis and selective application of the residency policy by Courtney Burnett.

There were numerous residency investigations between 2021-2022 wherein CSD treated other students more favorably than the Biagioni children.

████████████████









---

[3] "Pearson" was the virtual learning platform for students enrolled in the Decatur Virtual Academy. [Dep. of Defendant CSD (designee Amanda Lynch), Dkt. 130-9 at 205 (Ex. D-100) (CSD01049).].]







2.    <u>**Violation of Standard Internal Protocols**</u>:

i.    ***No Board meeting or vote to "approve" residency decision.***

CSD's pattern of antagonism reached its climax when it bypassed its standard internal decision-making processes, and Georgia law, to "approve" the withdrawal of the Biagioni children. Courts have long treated such deviations from ordinary procedures as powerful evidence of retaliatory motive. <u>See</u> <u>Hurlbert v. St. Mary's Health Care Sys.</u>, 439 F.3d 1286, 1299 (11th Cir. 2006) (defendant's failure to follow established procedures supports inference of retaliation) (citing <u>Bass v. Bd. of County Comm'rs, Orange County Fla.</u>, 256 F.3d 1095, 1108 (11th Cir. 2001) (stating that defendant's violation of its own hiring procedure could be evidence of pretext); <u>accord</u> <u>Rudin v. Lincoln Land Community Coll</u>, 420 F.3d 712, 727 (7th

Cir. 2005) ("[A defendant's] failure to follow its own internal [] procedures can constitute evidence of pretext.").

The CSD Board of Education website provides, "Board members do not have the authority to act **individually** in the name of the Board. **The Board may take action only at duly convened regular, special, or emergency meetings**." [Dkt. 130-8 at 176 (Ex. P26) (emphasis added).] James Herndon confirmed this practice of requiring the Board to convene a *meeting* in order to take official action, was the practice in place in October of 2021. [Dkt. 130-8 at 20:7-23.] Despite its failure to identify the Board's role in the residency decision in response to Interrogatory No. 4, supplemented as recently as July 15, 2025, CSD is taking the position now that the Board was the final decisionmaker in the decision to withdraw the Biagioni children from enrollment. [**Ex. A**, April Biagioni Decl. ¶ 23, att. A-9.]

The record evidence, however, says otherwise; James Herndon testified that the Board had "no role" in the decision to withdraw the Biagioni children. [Dkt. 130-8 at 76:10-15, 116:11-24.]  He was not privy to any conversations where the Board members discussed the withdrawal decision. [Dkt. 130-8, 74:10-15.] Both Mr. Herndon and Dr. Fehrman testified that the Board of Education did not convene a Board meeting or take a vote with respect to any alleged decision to withdraw the Biagioni children. [Dkt. 130-8 at 16:13-20, 118:15-25 (Herndon Dep.); Dkt. 130-7 at 166:3-15 (Fehrman Dep.).] Georgia law provides, "[l]ocal board of education

members should *work together with the entire local board of education and shall not have authority as independent elected officials but shall only be authorized to take official action as members of the board as a whole*." O.C.G.A. § 20-2-61 (emphasis added). To the extent CSD claims that they could not vote publicly on a student matter, the Board had the ability to call an executive session to discuss the matter confidentially. [Dkt. 130-8 at 176 (Ex. P26).] Despite the typical and legally required practice of meeting as a whole and voting before taking Board action, Dr. Fehrman claims that on or about October 4, 2021, she called each Board member by phone *individually* regarding the residency decision for Plaintiffs.[4] [Dkt. 120-2 at ¶ 148; Dkt. 130-7 at 166:3-15.]

### ii. *Rejection of typical proofs of residency*

Though general proof of ownership, such as a property tax bill and utility bill, were sufficient in other residency investigations in the face of allegations of renting out a Decatur property (*see,* ████████████), CSD refused to accept the same documentation from Plaintiffs. [Dkt. 130-8 at 179-182 (Ex. P101) (CSD00098-101) (Plaintiffs' documentation); Dkt. 130-13 at 68:4-5, 73:22-74:12

---

[4] Plaintiffs have moved to strike the declarations of Board members Heather Tell, Jana Johnson-Davis, Lewis Jones, and Tasha White (Dkt. 120-12 through 120-15), which were attached to Defendant's Summary Judgment Motion, as interposed in bad faith based on the witnesses explicitly stating they had no memory of this alleged conversation with Dr. Fehrman, under Fed. R. Civ. Proc. 56(d) and (h), and Defendant's counsel's representation that these witnesses had no unique underlying knowledge of the facts of this case. [Dkt. 135.]

(███████); Dkt. 130-13 at 86:24-87:2; Dkt. 130-13 at Ex. 73, pp. 281-289, CSD-06197-6205 (████████).] Plaintiffs were punished for being truthful about their location, while another family ████████████████████████████████ ████████████████████████████████████ [Doc. 130-13 at 52:1-53:10.] In contrast, CSD not only withdrew Plaintiffs mid-semester but did not even offer tuition-based enrollment to avoid disruption to the children's education. [April Biagioni Decl. ¶ 32.] The District did not immediately withdraw ████████████ despite proof ████████████████████████████████ ███ [Dkt. 130-13 at 98:1-25; *id.* at 293 (Ex. P76) (CSD-06432.)]

The District became aware that ████████████████████████



This investigation arose after the Biagionis', but CSD did not use the electronic surveillance tool to determine his location that Mr. Melton used on the Biagionis. These departures from policy, taken together with Fehrman and Burnett's antagonistic conduct toward Mrs. Biagioni's speech, allow a reasonable jury to find that the withdrawal was not a routine residency-enforcement action, but the

culmination of months of retaliatory hostility and two retaliatory CSD leaders seizing an opportunity to remove an inconvenient challenge to their authority.

### iii.    *Plaintiffs relied on statements of CSD officials that a benefit of the DVA was that families could travel.*

District officials, including Kristy Beam, Dr. Fehrman, and Eston Melton worked with parents, teachers, and community members to develop the Decatur Virtual Academy. [Dkt. 120-2 at ¶¶ 80, 86-88.] Mrs. Biagioni was part of the advisory team working to develop the DVA. [Dkt. 120-2 at ¶ 87.] Another parent named Derrick Peavy also joined the parent advisory team. [Decl. of Derrick Peavy at ¶¶ 3-6.] Defendant admits that at the May 11, 2021 Board meeting, Kristy Beam made the following statement about DVA:

> I believe that our program will allow us to not only serve and accommodate families that are not ready to return in person due to COVID, but also **a variety of other families** that this may be a perfect option [for], **such as sports and film families that frequently need to travel for extended periods,** our hospital and homebound students, students seeing acceleration or credit recovery, **[and] atypical students that simply were not engaged or that did not thrive in the typical school environment.**

[Dkt. 120-2 at ¶ 92 (emphasis added).] Dr. Beam discussed the freedom to travel many times in meetings with parents to plan for the DVA, and never mentioned the residency requirement or any temporal or geographic limits on the freedom to travel while accessing asynchronous instruction as part of the DVA. [Peavy Decl. at ¶¶ 7-12; April Biagioni Decl. at ¶¶ 24.-25] Indeed, Beam's statement from the May 11,

2021 meeting made clear to families that the DVA was designed to be flexible, and a "variety of families," with "atypical students" could benefit from the freedom to travel "for extended periods." [Dkt. 120-2 at ¶ 92.] Ms. Biagioni relied upon discussions and communications with Dr. Beam throughout the planning for the DVA regarding the freedom to travel for DVA families, when deciding to travel while enrolled in DVA. [**Ex. A**, April Biagioni Decl. at ¶ 24.]

Defendant contends that, "[e]ven if Ms. Biagioni's speech was a motivating factor in the withdrawal decision, CSD would have nonetheless withdrawn the minor Plaintiffs based on violation of the residency policy." [Doc. 120-30 at 12.] This is hotly disputed given the number of students that were permitted to remain enrolled under almost identical circumstances and, "even when there are non-pretextual reasons for an adverse [] decision—as the government says there are here—the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." Babb v. Sec'y, Dep't of Veterans Affairs, 992 F.3d 1193, 1204 (11th Cir. 2021).

### 3. **CSD withdrew the Biagioni children at its first opportunity.**

Public school district enrollment is not at-will. Ga. Const. art. VIII, § 1. CSD states there were no earlier instances when CSD officials became aware of the family traveling during school days. [Dkt. 120-2 at ¶¶ 110, 125.] On July 28, 2021, when school was not in session, Ms. Burnett became aware of Mrs. Biagioni's Facebook

post advertising the home for rent starting September 1, 2021. [*Id.* at ¶ 120-2 at ¶¶ 123-124.] Burnett could not, however, immediately take any action based on the Facebook ad, so she instructed Moore to "watch for" whether someone tried to enroll students from Plaintiffs' address. [*Id.* at ¶¶ 124-125.] In late September 2021, James Herndon purportedly heard from community members about the rental and reported it to Dr. Fehrman. [Id. at ¶¶ 126-127.] Dr. Fehrman directed Ms. Burnett to investigate, and Ms. Burnett directed Ms. Moore to "commence the residency process." [Id. at ¶¶ 129-130.] CSD has not identified any earlier instance where it substantiated a residency violation by Plaintiffs but chose not to withdraw them from enrollment. Accordingly, the temporal gap between Plaintiffs' protected activity and the adverse action is further undermined by the fact that there were no earlier opportunities for CSD to withdraw the children.

### B. Burnett was the final decision-maker in the decision to withdraw Plaintiffs' children from enrollment for purposes of *Monell*.

Under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94 (1978) and its' progeny, the unconstitutional acts of a final decision-maker are sufficient for entity liability under Section 1983. Pembaur v. City of Cincinnati, 475 U.S. 469, 485 (1986). Ms. Burnett testified in her deposition that Dr. Fehrman had delegated to her final decision-making authority regarding residency decisions to Burnett. [Doc. 130-6 at 26:2-8.] Dr. Fehrman also testified that Ms. Burnett, "was [her] designee for decision-making with respect to residency decisions when a residency issue was

flagged." [Doc. 130-7, 57:2-5.] Fehrman did not independently investigate every residency decision Burnett made. [Doc. 130-7, 161:13-25.]

Defendant also failed to identify the Board of Education as a final decisionmaker in written discovery responses specifically asking for the identity of the final decisionmaker related to residency decisions and investigations. [April Biagioni Decl. ¶ 24, Defendant's 2nd Supplemental Resp. to Interrog. No. 4 (July 15, 2025.)] Rather, Defendant stated that during 2021, Ms. Moore was responsible for investigating residency and Ms. Moore reported to Burnett, who, in turn, reported to Dr. Fehrman. [Id.] As recently as July 15, 2025, a month before discovery expired, Defendant supplemented that response to add only that school-level personnel also investigated some residency issues and then referred further action to Ms. Moore and Ms. Burnett, with no mention of the Board. Id.

Nevertheless, Defendant now attempts to shift final decision-making responsibility to the Board of Education in the face of substantial evidence of Fehrman and Burnett's obvious contempt for Ms. Biagioni. [Dkt. 120-30 at 21-22.] But, Board member Herndon unequivocally testified that he had "no role" in the residency decision, and the Board had no role and took no official action on the Biagioni residency decision either. [Dkt. 130-8 at 59:14-17, 75:15-76:15, 116:11-24.] The Board of Education's practice in 2021 to take any official action was to convene a "regular, special or emergency meeting." [Dkt. 130-8 at 20:15-23; id. at

176 (Ex. P26).] The Board had the ability to discuss confidential matters in executive session. [Id.] Yet, there was no meeting or vote by the Board of Education for purposes of deciding Plaintiffs' residency and withdrawal. [Dkt. 130-8 at 16:18-20, 59:14-17, 118:15-25; see also, Dkt. 130-9, 30(b)(6) Deposition of CSD at 76:1-12.] Rather, Dr. Fehrman called each Board member individually to discuss the Biagioni's residency. [Dkt. 130-7 at 166:2-15.] Georgia law prohibits members of local boards of education from acting "individually" or separately, requiring them to act "together…as a whole." O.C.G.A § 20-2-61. Herndon was not privy to any discussions with any other Board members about this case. [Dkt. 130-8, 74:10-15.] As far as Plaintiffs' "appeal," Mr. Herndon testified that an appeal of a residency decision was "not a thing that [he] believed to even exist." [Id. at 116:11-24.] As such, the Board simply could not be the final decision maker here and the Board member declarations attached to Defendant's motion are contrary to the evidence and unworthy of any credence.

### C. **Even if the Court finds that the Board was the final decisionmaker, the Board was a cat's paw for Fehrman/Burnett's retaliatory animus.**

Where a final decisionmaker blindly relies on the recommendation of a biased subordinate without independently investigating the basis for the recommendation, the final decisionmaker serves as a cat's paw for the unlawful motive of the subordinate in taking adverse action against the plaintiff. Staub v. Proctor Hosp., 562 U.S. 411, 416 (2011). Neither Dr. Fehrman nor the Board independently

investigated Burnett's decision to withdraw the Biagioni children from enrollment. [Doc. 130-7 at 161:13-25; Dkt. 130-8 at 57:4-20, 59:3-17.] Mr. Herndon denied speaking with anyone at the District other than Dr. Fehrman regarding the Biagioni residency decision. [Dkt. 130-8 at 59:3-13.] Dr. Fehrman did not, during her individual phone calls, share with Board members any of the numerous other students who were allowed to remain enrolled despite violating the policy. [Dkt. 130-7 at 166:16-167:4.] Dr. Fehrman testified that every time that there was a residency question, "Courtney was directed to use the administrative regulation with [] Moore to determine if students were living within the school system." [Dkt. 130-7 at 154:13-25.] Dr. Fehrman did not go behind Burnett to determine what she was doing, claiming she was implementing the policy. [Dkt. 130-7 at 155:9-156:9.]

It is abundantly clear that CSD realized *while they were drafting their summary judgment motion* the need to shift the final decisionmaker to the Board based on Burnett and Fehrman's obvious contempt for Ms. Biagioni's speech, multiple comparators showing that CSD treated the Biagionis worse than even parents who defrauded the District, and heightened scrutiny of Plaintiffs. CSD then violated its own procedures and the law to decide without a meeting or vote to "approve" the residency decision via individual phone calls that most of the Board members do not remember. Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motion and allow their claim to proceed to a jury.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the within Response was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

**BUCKLEY BALA WILSON MEW LLP**

*/s/ Anita K. Balasubramanian*
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
Kathleen Kacynski
Georgia Bar No. 587883
kkacynski@bbwmlaw.com
201 17th St. NW
Suite 630
Atlanta, GA 30363
Telephone: (404) 781-1100
Facsimile:(404) 781-1101

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **APRIL BIAGIONI,** Individually and as next friend of A.B., D.B., and J.B., **MARK BIAGIONI,** Individually and as next friend of A.B., D.B., and J.B., | ) ) ) ) ) | |
| **Plaintiffs,** | ) | **Civil Action File No.** |
| **v.** | ) | **1:23-cv-00514-LMM** |
| | ) | |
| **CITY SCHOOLS OF DECATUR,** | ) | |
| | ) | |
| **Defendant.** | ) ) ) ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2025, I filed the foregoing

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION**

**FOR SUMMARY JUDGMENT** using the CM/ECF system which will

automatically send e-mail notification of such filing to all counsel of record as

follows:

Keri P. Ware - kware@wmdlegal.com
Jill T. Young - jyoung@wmdlegal.com
Laura Moore – lmoore@wmdlegal.com

The undersigned also served an unredacted copy of Plaintiffs' Response in

Opposition, along with supporting documents, upon the above counsel via email.

_/s/ Anita K. Balasubramanian_
Anita K. Balasubramanian
Georgia Bar No. 372029